# 24-3190-cv

## United States Court of Appeals
### *for the*
## Second Circuit

---

TRIREME ENERGY DEVELOPMENT, LLC,
TRIREME ENERGY HOLDINGS, INC.,

*Plaintiffs-Appellants,*

– v. –

RWE RENEWABLES AMERICAS, LLC,
RWE RENEWABLES SERVICES, LLC,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR DEFENDANTS-APPELLEES

---

ELI B. RICHLIN
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 497-7781

SUSAN K. LEADER
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
(310) 620-5700

SARA N. BRICKER
PAUL C. GROSS
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

*Attorneys for Defendants-Appellees*

---

 (800) 4-APPEAL • (379815)

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees RWE Renewables Americas, LLC and RWE Renewables Services, LLC (together, ("RWE")) make the following disclosures:

RWE Renewables Americas, LLC and RWE Renewables Services, LLC (n/k/a RWE US Holdings, LLC and RWE Clean Energy Services, LLC, respectively) are indirect wholly owned subsidiaries of RWE AG, which is a publicly held corporation. No other publicly held company owns 10% or more of RWE AG's stock.

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ....................................i

TABLE OF AUTHORITIES ................................................................iv

PRELIMINARY STATEMENT ...........................................................1

COUNTERSTATEMENT OF THE ISSUES PRESENTED...................5

COUNTERSTATEMENT OF THE CASE..............................................5

    I.     The Merger Agreement ......................................................5

    II.    Negotiation of Section 7.6(c) ...........................................8

    III.   The Asset Swap and Internal Reorganization ...................11

        A.    The Asset Swap..........................................................11

        B.    Internal Reorganization..............................................12

    IV.   *Trireme I*: Cassadaga Lawsuit.........................................15

    V.    *Trireme II*: Present Lawsuit.............................................18

SUMMARY OF THE ARGUMENT ......................................................20

    I.     Trireme's Sole Claim Is Barred by Res Judicata ...............20

    II.    If This Court Opts to Reach the Merits, the District Court's Finding That RWE's Alleged Conduct Did Not Breach the Merger Agreement Should Be Affirmed.............................21

STANDARD OF REVIEW ...................................................................22

ARGUMENT .....................................................................................25

    I.     The District Court Correctly Held That Trireme's Suit Is Barred by the Doctrine of *Res Judicata* .............................25

        A.    Trireme's Suit Is Barred by Its Failure to Appeal the Denial of Leave to Amend Its Complaint in *Trireme I* ...........27

        B.    RWE's Internal Reorganization Could Have Been Discovered Through the Exercise of Due Diligence ...............29

ii

       i.     The District Court Correctly Found that Trireme
Could Have Discovered the Evidence
Underlying Its Section 7.6(c) Claim ............................... 29

       ii.    Trireme's Arguments to the Contrary Are Wrong ......... 32

II.    The District Court Correctly Held that RWE's Internal
Reorganization Did Not Violate Section 7.6(c) ................................... 42

    A.    The District Court Correctly Held that Section 7.6(c) Is
Ambiguous ................................................................................ 44

    B.    The District Court Correctly Found Based on Extrinsic
Evidence that Section 7.6(c) Does Not Apply to
Internal Reorganizations ............................................................ 55

III.   Trireme Is Not Entitled to a Judgment ................................................ 58

CONCLUSION ............................................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Bessemer City,*
  470 U.S. 564 (1985) ........................................................... 24, 36, 57, 58

*Armstrong v. McAlpin,*
  699 F.2d 79 (2d Cir. 1983) ..................................................37

*Arrigo v. Link,*
  836 F.3d 787 (7th Cir. 2016) ...............................................28

*Assocs. Int'l, Inc. v. Altai, Inc.,*
  126 F.3d 365 (2d Cir. 1997) ................................................23

*Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.,*
  945 F.3d 53 (2d Cir. 2019) ..................................................29

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.,*
  No. 14-cv-7134 (VM), 2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015)...............47

*Beck Chevrolet Co. v. General Motors LLC,*
  787 F.3d 663 (2d Cir. 2015) ................................................24

*Brass v. Am. Film Techs., Inc.,*
  987 F.2d 142 (2d Cir. 1993) ................................................54

*Bufkin v. Collins,*
  145 S. Ct. 728 (2025).........................................................24

*Cambridge Cap. LLC v. Ruby Has LLC,*
  675 F. Supp. 3d 363 (S.D.N.Y. 2023) ....................................... 44, 45

*Caron v. TD Ameritrade,*
  No. 19-cv-9015 (AJN), 2020 WL 7027593 (S.D.N.Y. Nov. 30, 2020)..............36

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.,*
  773 F.3d 110 (2d Cir. 2014) ................................................43

*Cho v. Blackberry Ltd.,*
  991 F.3d 155 (2d Cir. 2021) ................................................35

*Christman v. Saint Lucie County,*
  509 F. App'x 878 (11th Cir. 2013)..........................................28

iv

*Cole v. Macklowe*,
    99 A.D.3d 595 (1st Dep't 2012) ............................................................52

*Comput. Assocs. Int'l, Inc. v. Altai, Inc.*,
    126 F.3d 365 (2d Cir. 1997) ...............................................................23

*EDP Med. Comput. Sys., Inc. v. United States*,
    480 F.3d 621 (2d Cir. 2007) ...............................................................25

*EFCO Corp. v. U.W. Marx, Inc.*,
    124 F.3d 394 (2d Cir. 1997) ......................................... 1, 20, 26, 28

*Federated Dep't Stores, Inc. v. Moitie*,
    452 U.S. 394 (1981) ............................................................................25

*Flynn v. McGraw Hill LLC*,
    120 F.4th 1157 (2d Cir. 2024) ............................................................47

*Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*,
    20 N.Y.3d 438 (2013) .................................................................. 51, 52

*Garza v. U.S. Bureau of Prisons*,
    284 F.3d 930 (8th Cir. 2002) ...............................................................23

*Greenfield v. Philles Recs., Inc.*,
    98 N.Y.2d 562 (2002) .........................................................................54

*Greenwich Cap. Fin. Prods., Inc. v. Negrin*,
    74 A.D.3d 413 (1st Dep't 2010) .................................................. 44, 52

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) ...............................................................42

*Hart v. Kinney Drugs, Inc.*,
    888 N.Y.S.2d 297 (3d Dep't 2009) .....................................................54

*Home Team 668 LLC v. Town of E. Hampton*,
    2024 WL 4764000 (2d Cir. Nov. 13, 2024) ............................ 1, 20, 28

*In re Adelphia Recovery Tr.*,
    634 F.3d 678 (2d Cir. 2011) ...............................................................35

*In re Layo*,
    460 F.3d 289 (2d Cir. 2006) ...............................................................32

*In Time Prods., Ltd. v. Toy Biz, Inc.*,
    38 F.3d 660 (2d Cir. 1994) .......................................................... *passim*

v

*Jade Realty LLC v. Citigroup Commercial Mortgage Trust*,
    20 N.Y.3d 881 (2012)........................................................50

*Jusino v. Fed'n of Cath. Tchrs., Inc.*,
    54 F.4th 95 (2d Cir. 2022) ......................................... 26, 47

*Kamdem-Ouaffo v. Pepsico, Inc.*,
    160 F. Supp. 3d 553 (S.D.N.Y. 2016),
    *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016) ............................26

*King v. Hoover Grp. Inc.*,
    958 F.2d 219 (8th Cir. 1992) ...........................................28

*L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) ...........................................51

*Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*,
    2 N.Y.3d 495 (2004)......................................................54

*L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*,
    198 F.3d 85 (2d Cir. 1999) ..................................... *passim*

*Matter of Wallace v. 600 Partners Co.*,
    86 N.Y.2d 543 (1995).......................................... 49, 50, 52

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ...........................................41

*Mitchell v. Abrams*,
    89 A.D.3d 621 (1st Dep't 2011) ........................................52

*Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*,
    190 F.3d 64 (2d Cir. 1999) .............................................22

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
    830 F.3d 152 (2d Cir. 2016) ....................................... 23-24

*Phoenix Canada Oil Co. v. Texaco Inc.*,
    749 F. Supp. 525 (S.D.N.Y. 1990) .....................................41

*Postlewaite v. McGraw-Hill, Inc.*,
    411 F.3d 63 (2d Cir. 2005) ......................................... 52-53

*Principal Nat'l Life Ins. Co. v. Coassin*,
    884 F.3d 130 (2d Cir. 2018) ...........................................29

*Professional Fighters League, LLC v. Takeover Industries, Inc.*,
  ---F. Supp. 3d---, 24-cv-1335 (GS),
  2025 WL 833873 (S.D.N.Y. Mar. 17, 2025)......................................48

*RCJV Holdings, Inc. v. Collado Ryerson. S.A. de C.V.*,
  18 F. Supp. 3d 534 (S.D.N.Y. 2014) ...................................... 45, 46, 48

*Rec. Club of Am., Inc. v. United Artists Recs., Inc.*,
  890 F.2d 1264 (2d Cir. 1989) ...............................................54

*Rivas v. Fischer*,
  687 F.3d 514 (2d Cir. 2012) ............................................ 23, 29

*Saud v. Bank of N.Y.*,
  929 F.2d 916 (2d Cir. 1991) ...................................... *passim*

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
  7 F.3d 1091 (2d Cir. 1993) ................................................43

*TechnoMarine SA v. Giftports, Inc.*,
  758 F.3d 493 (2d Cir. 2014) ...............................................25

*Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*,
  No. 24-159-cv, 2025 WL 1374732 (2d Cir. May 13, 2025) ...................... *passim*

*U.S. Bank National Ass'n v. Village at Lakeridge, LLC*,
  583 U.S. 387 (2018) .......................................................24

*Veal v. Geraci*,
  23 F.3d 722 (2d Cir. 1994) ............................................ 32, 33

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015)......................................44

*Zest Anchors, LLC v. Biomet 3i, LLC*,
  No. 1:23-cv-07232 (JLR), 2024 WL 4008164 (S.D.N.Y. Aug. 30, 2024) .... 48-49

**Statutes & Other Authorities:**

Restatement (Second) of Judgments § 25 (Am. L. Inst. 1982) ...............................28

## PRELIMINARY STATEMENT

This appeal is the proverbial second bite at the same apple. In 2022, Appellants Trireme Energy Development, LLC and Trireme Energy Holdings, Inc. (together "Trireme") tried to amend their complaint and assert the very same claim for breach of contract on appeal here in an *earlier* litigation ("*Trireme I*") against RWE's predecessors-in-interest. After Trireme's motion for leave to amend in *Trireme I* was denied on untimeliness grounds, *Trireme I* proceeded to trial and a final judgment was entered against Trireme. Notably, although Trireme (unsuccessfully) appealed elements of that final judgment, Trireme *never* appealed the denial of its motion for leave to amend in *Trireme I*.

As such, *res judicata* applies and the district court's (Rochon, J.) judgment dismissing the claim as barred by *res judicata* must be affirmed. *See, e.g.*, *Home Team 668 LLC v. Town of E. Hampton*, 2024 WL 4764000, at *3 (2d Cir. Nov. 13, 2024) (quoting *EFCO Corp. v. U.W. Marx, Inc.*, 124 F.3d 394, 400 (2d Cir. 1997)) (holding that "[w]here a plaintiff's motion to amend its complaint in [a] first action is denied, and [the] plaintiff fails to appeal the denial, *res judicata* applies to the claims sought to be added in the proposed amended complaint"). Beyond that dispositive point, there are additional substantive reasons to affirm the district court's post-trial ruling, which are set forth in a thorough 87-page opinion.

\*\*\*

1

This case emerges from Trireme's late 2017 sale of a portfolio of development stage wind farm projects to RWE's predecessor-in-interest (a company called Innogy Renewables US, LLC ("IRUS")). The agreement of sale (the "Merger Agreement") provided Trireme with significant upfront consideration as well as *potential* earn-out or "Milestone" payments *if* projects in the portfolio met certain enumerated goals. Recognizing that wind farm projects are often resold while in development, the parties—Trireme and IRUS, at the time—agreed that IRUS may not "sell[,] assign, transfer, or otherwise dispose of" wind farm projects still eligible for a potential Milestone payment without first either obtaining Trireme's consent or paying the project's associated Milestone payment. A2906.

That provision—Section 7.6(c)—is found in the section of the Merger Agreement governing Milestone payments and was included so that Trireme would be protected if a project with a Milestone payment pending was sold to an external third party.

In an entirely separate transaction that closed on June 30, 2020, a German utility called RWE AG (Appellees' corporate parent) purchased all of IRUS, including its wind farm projects. RWE AG subsidiaries (Appellees here) assumed all of IRUS's rights and obligations to Trireme under the Merger Agreement. The parties agree that this change in ownership—which directly impacted Trireme—did *not* breach the Merger Agreement.

2

Following RWE AG's purchase of IRUS, RWE AG subsidiaries effected an internal reorganization to consolidate functions and manage tax risk. In connection with this, RWE AG moved the wind farm projects from one RWE AG subsidiary (IRUS) to another. Unlike RWE AG's purchase of IRUS, this internal reorganization had *no impact* on Trireme.

Nevertheless, Trireme insists that this internal reorganization, which did not impact Trireme's ability to collect Milestone payments from IRUS's successor, violates Section 7.6(c)'s prohibition on "sell[ing,] assign[ing], transfer[ring], or otherwise dispos[ing]" of the wind farm projects and so RWE must pay Trireme $112 million—the aggregate maximum value of all the Milestone payments available under the Merger Agreement. A2906. Trireme claims it is entitled to this windfall even though it was not impacted by the internal reorganization and, in fact, purportedly did not even discover it had happened until well over a year later. The district court rightly rejected this theory.

*First*, the district court correctly held that Trireme's sole claim for breach of contract is barred by *res judicata*. Based on factual findings (reviewable only for clear error), the district court determined that documents available to Trireme were "sufficient to put Trireme on notice" of the "essential facts" underlying its claim in time to assert the claim in earlier litigation. Special Appendix ("SPA") 98. Consequently, *res judicata* bars Trireme from relitigating the claim here. Even

3

absent that finding, Trireme's claim would *still* be barred, as Trireme sought (but was denied) leave to amend its complaint to assert an identical claim in earlier litigation and never appealed that order.

*Second*, and in the alternative, the district court correctly held that Appellees "did not breach Section 7.6(c) of the Merger Agreement when they internally restructured." SPA106. Finding that the formalistically literal reading of the plain language would lead to an unreasonable result at odds with the Merger Agreement as a whole, the district court held that the language of Section 7.6(c) was ambiguous. Then, after reviewing the extrinsic evidence and hearing witness testimony, the district court found that the parties intended Section 7.6(c) to apply to sales of projects to third parties (and not internal reorganization of assets).

As explained below, Trireme's objections to these findings lack merit. On *res judicata*, Trireme tries to limit the doctrine to only those instances where there is evidence that a plaintiff *knows* about a claim, but nevertheless fails to pursue it. But that is not the law—*res judicata* applies when a plaintiff *could* have known about a claim in time to assert it in earlier litigation, not the plaintiff's actual knowledge. The same is true with respect to ambiguity. Trireme argues that a provision is only ambiguous where there is some confusion as to the meaning of an individual word or phrase, ignoring New York law holding that a latent ambiguity can be found where the seemingly literal meaning of a provision is absurd or unreasonable, or

4

where it does not comport with the agreement as a whole. Finally, although Trireme points to evidence that it claims support its position, that does not mean that the district court's findings, which were based on a review of all of the evidence, are clearly erroneous.

***

The district court's findings and conclusions are both just and in lockstep with applicable law as applied to the facts. The parties never intended for an internal reorganization to function as a winning lottery ticket for Trireme, entitling it to over $100 million in unearned Milestone payments. The district court correctly applied the law and construed the Merger Agreement to avoid that absurd, commercially unreasonable outcome. The decision below should be affirmed in full.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

1.      Whether the district court correctly held that Trireme's sole claim is barred by *res judicata*.

2.      Whether the district court correctly held that RWE's alleged conduct did not breach Section 7.6(c) of the parties' Merger Agreement.

## COUNTERSTATEMENT OF THE CASE

### I.    The Merger Agreement

Prior to the events at issue in this litigation, Trireme and its subsidiary, EverPower Wind Holdings, Inc. ("EverPower"), owned a portfolio of both

5

operational and development stage wind and solar farm projects. A6707–08 ¶¶ 18–19. In early 2017, Trireme and its 95% owner, Terra Firma Capital Partners ("Terra Firma"), a British private equity firm, began exploring an exit from its investment in EverPower and its operational and development portfolios. A7097; A1260:17–24. In or around mid-2017, Trireme and IRUS commenced months-long negotiations over IRUS's potential acquisition of EverPower's development portfolio. A1334:11–19; A2117 at 36:10–14. At the time, IRUS was a newly formed company established in 2016 by the German energy utility, Innogy SE, with the aim to establish a presence in the U.S. onshore wind energy market, including achieving 500 megawatts of operating renewables in the U.S. by the end of 2020. A1658:15–A1659:1; A1655:9–19; A6377. Innogy SE, in turn, was a public company majority-owned by RWE AG, which was known to and understood by Trireme. A6375.

Though Innogy SE, IRUS's parent and financial backer, was a large player in the European energy market with thousands of employees, as of mid-2017, IRUS was essentially a shell company with fewer than five employees, no renewable energy experience in the U.S. market, and no development or operational assets. A1732:8–A1733:16. IRUS therefore sought to acquire a portfolio of development stage assets with the potential to become operational by 2020. A1658:15–A1659:1.

The parties began negotiating the Merger Agreement in mid-2017. A2117 at 36:10–14. The parties referred to these negotiations as "Project Aura." A1248:1–8. Then-CEO of IRUS, Andrew Young, led the negotiations on behalf of IRUS, and Ross Brinklow, a Terra Firma principal and director of Trireme, took the lead on behalf of Terra Firma on the other side. A2727 at 12:12–15; A2223:19–22.

On December 21, 2017, Trireme and IRUS entered into the Merger Agreement. A2855. IRUS agreed to pay Trireme $50 million in upfront consideration as well as potential additional Milestone payments if certain projects were successfully developed within the agreed upon timeframe. A2876 § 3.1. Under the Merger Agreement, each of the EverPower projects that could trigger a Milestone payment was defined as a "Target Project," and each of the Target Projects was in turn associated with one or more "Development Companies" that owned the project's assets. A2873 § 1.1; A2987, Annex 1. Innogy SE provided a parent company guarantee ("PCG") for IRUS, at the insistence of Trireme, as an assurance that IRUS could make the Milestone payments and cover IRUS's obligations under the contract. A3066; A1270:14–A1271:4.

As a result of the Merger Agreement, IRUS acquired 100 percent of the equity interests in the wind and solar development projects previously owned by Trireme. A6709 ¶¶ 29–31. IRUS held the Development Companies through intermediary subsidiaries with no employees. A6710 ¶ 32; A1708:20–A1709:6.

7

## II. Negotiation of Section 7.6(c)

One key deal point for IRUS during the negotiations was maintaining control over the development of the wind farm projects so that it would not be forced to develop a project if it was not economical to do so. A2120 at 48:20–A2121 at 50:17. Trireme, on the other hand, was primarily concerned with ensuring the continued development of the assets post-sale and payout of the associated Milestones. A1428:3–18. Section 7.6 of the Merger Agreement, entitled "Payment Milestone," memorialized IRUS's narrow obligations to develop projects and make contingent Milestone payments upon the achievement of certain specified conditions. A2906 § 7.6.

Sections 7.6(a) and (c) of the Merger Agreement contemplated at least three development alternatives for IRUS post-close: (1) continued development of the projects; (2) abandonment of the projects; or (3) sale of the projects. A2906 §§ 7.6(a), (c); A2279:11–22. IRUS was obligated to exercise "commercially reasonable efforts" to continue to develop the projects, but otherwise retained "sole discretion" over the details, manner, and schedule of those development efforts. A2906 §7.6(a). IRUS was also permitted to abandon any project prior to October 1, 2019, without owing Trireme a Milestone payment, so long as it provided Trireme notice of its intent to do so. *Id*. Under Section 7.6(b), Trireme was entitled to

8

quarterly updates regarding the development of the projects so that Trireme could stay apprised of the progress towards the Milestones.  A2906 § 7.6(b).

At issue in this litigation is Section 7.6(c).  It provides that:

> Purchaser shall not sell, assign, transfer[,] or otherwise dispose of any of the assets, rights[,] and other properties of a Target Project or the equity interests of a Development Company prior to December 31, 2020 without the consent of the Member Representative, unless prior to or contemporaneously with such sale, assignment, transfer[,] or other disposition Purchaser pays the Payment Milestone Amount that would have been payable with respect to such Target Project if the Target Project had achieved the Payment Milestone as of the date of such sale, assignment, transfer[,] or other disposition.

A2906 § 7.6(c).  The drafting history, contemporaneous transaction documents, and witness testimony all demonstrate that during the negotiations, the parties exclusively discussed Section 7.6(c) in the context of sales to third parties. *See, e.g.,* SPA53–54.

During the negotiations, Trireme shared with IRUS that third party buyers had expressed interest in purchasing several Aura projects (specifically, Mud Springs and Scioto Ridge).  Such interest was consistent with the parties' general familiarity with the common practice of "flipping" development projects in the renewable energy industry.  A5504; A2734 at 38:10–25; A1376:1–15.

The parties' negotiation of Section 7.6(c) focused on how to handle potential Milestone payments in the event of the sale by IRUS of projects with a pending, potential Milestone payment to a third party.  A1443:12–A1444:9.  Trireme did not

9

want to be forced to chase a non-contracting third party for payment, nor come to find that the buyer lacked the means to pay the Milestone payment. A1446:5–A1447:14. In an attempt to address Trireme's concerns, IRUS proposed adding language to the agreement defining an "Approved Third Party" for purposes of sale. *See, e.g.*, A3641; A3829; A3873; A3689–90; A6112. Trireme did not agree to the Approved Third Party concept, but the parties added a consent provision so that in the event of a sale of an eligible asset, IRUS could either pay the Milestone payment or seek Trireme's consent for IRUS to transfer the Milestone payment obligation to the buyer or any other terms or conditions the parties agreed upon. A2906.

Contemporaneous transaction documents throughout the negotiations, such as term sheets, issue lists, and talking points uniformly reference Section 7.6(c) in the context of asset sales. *See* SPA56–61. At trial, witnesses also agreed that the negotiating parties never discussed applying Section 7.6(c) to internal reorganizations. *See, e.g.*, 2731 at 29:4–15; A1447:15–21.

Following the close of the Merger Agreement, the parties applied Section 7.6(c) when negotiating the potential third party sale of both the Mud Springs and Mason Dixon projects. *See* SPA69–72.

10

### III.   The Asset Swap and Internal Reorganization

### A. The Asset Swap

As mentioned above, at the time of signing the Merger Agreement, IRUS's parent company, Innogy SE, was majority owned by RWE AG. A6375. On March 12, 2018, RWE AG and E.ON SE ("E.ON") (a third German energy utility) agreed to an extensive exchange of assets whereby RWE AG would sell its 76.8 percent stake in Innogy SE to E.ON in exchange for the renewable businesses of both Innogy SE, including IRUS, and E.ON, including E.ON's U.S. based renewables subsidiary (the "Asset Swap"). A6366–67. The public announcement made clear that RWE AG would remain IRUS's ultimate parent pre- and post-Asset Swap. A6367.

Because IRUS was not privy to the information from its upstream parent RWE AG, the announcement of the Asset Swap was a surprise to Mr. Young and others at IRUS. A6364; A2741 at 67:5–68:7. As of March 2018, the Merger Agreement with Trireme had been executed but the transaction had not yet closed, and on the same day as the announcement, Mr. Young forwarded RWE AG's announcement to Mr. Brinklow and James Spencer, Trireme's CEO. A6366. Mr. Young highlighted key points of the transaction, including that: (i) IRUS remained committed to closing the Aura transaction and advancing its projects; and (ii) that following the completion of the transaction, the renewable energy businesses of both E.ON and Innogy would

11

be united under the RWE umbrella. A6366–67. While Terra Firma immediately investigated the potential implications that the Asset Swap would have on the Aura transaction, it never discussed with IRUS amending the Merger Agreement to include additional protections for Trireme, delaying the closing, or backing out of the transaction. A6369; A1481:12–23.

The Asset Swap between E.ON and RWE was completed on June 30, 2020. A4679–70; A1779:4–6. In exchange for the acquisition of IRUS, RWE Renewables US, LLC ("RWE US") paid Innogy SE approximately $500 million. A1937:7–16. At that point in time, IRUS became a wholly owned subsidiary of RWE US, and the Development Companies were still held under IRUS subsidiaries. A6639. Notably, Trireme does not allege that Innogy SE's sale of IRUS violated Section 7.6(c) of the Merger Agreement. A6715 ¶¶ 60–63; SPA85. Rather, Trireme's breach of contract claim arises from a subsequent internal reorganization conducted by RWE US following the Asset Swap. *See* A6705–06.

### B. Internal Reorganization

In anticipation of the Asset Swap closing and IRUS moving underneath the RWE umbrella, in 2020, IRUS and RWE US formed a "working group" to plan an internal restructuring of corporate subsidiary entities to be effectuated following the integration. A6561–62. The working group's objective was to execute the post-close integration of IRUS's legal entities within RWE US while eliminating

12

redundancies and prioritizing efficiency with respect to taxes, accounting, and HR operations. A6561; A1948:25−A1950:10. The parties sought a post-close reorganization that would not create any tax liability or parallel structures that would require duplicative tax filings or separate accounting systems. A1914:18−A1915:2. To that end, and to ensure the transaction occurred on a tax-equitable basis, the reorganization was effectuated through assignments or contributions—rather than asset sales—of certain IRUS disregarded subsidiaries immediately after the Asset Swap closed. A1914:5−10; A1923:22−A1925:17. On June 16, 2020, the working group circulated near-final charts reflecting the assignment of disregarded IRUS entities to RWE US subsidiaries. A6635.

On July 1, 2020—the day after the Asset Swap closed, and with IRUS having been acquired by RWE US—IRUS's intermediate subsidiaries, IRUS Wind Holdings LLC and IRUS Solar Holdings LLC, assigned their membership interests in IRUS's wind and solar development and operations holding companies to parallel RWE US subsidiaries. A4316−21; A6653−54; SPA86. IRUS's disregarded entities were therefore contributed into RWE regarded entities. A1926:9−14. As RWE US and RWE AG remained the indirect parents of the Development Companies at all times post-Asset Swap, the assignments of IRUS's disregarded subsidiaries were treated as internal transactions between entities under the same parent company for tax and accounting purposes. A1938:9−24. Specifically, the internal reorganization

13

qualified as a tax-neutral section 351 transaction because the same entity—RWE US—owned the subsidiaries making and receiving the assignments. A1926:9-19; A1938:9–24. No monetary or cash consideration was exchanged between IRUS and RWE US for this internal reorganization. A1924:3–A1925:17; A1926:9–19.

After the internal reorganization, progress on the Aura projects continued as before. A7093–96. Moreover, post-Asset Swap and following the internal organization, RWE US remained responsible for the development and construction of the Aura projects and for paying Trireme any Milestone payments triggered under the Merger Agreement. A1527:10–13; A1780:1–18. RWE also continued to provide Trireme with quarterly development updates, as required under Section 7.6(b) of the Merger Agreement. A7089–96; A7098–99.

Importantly, material aspects of the internal reorganization were portrayed in multiple public filings. Public filings with the Federal Energy Regulatory Commission ("FERC") and the New York Public Service Commission ("NYPSC") in 2019 included organizational charts that depicted the key elements of the internal assignments: IRUS's intermediate holding companies assigned the development and operational LLCs holding the Development Companies from IRUS to the corresponding RWE subsidiaries. A4242; A4278; A4282–84; A4301; A4312–15; A1899:22–A1900:10. On September 25, 2020, RWE subsidiaries also filed public Delaware Certificates of Merger announcing the merger of IRUS's remaining

14

intermediate subsidiaries with RWE US subsidiaries. A6687–94. Later, in December 2020, RWE Renewables Services, LLC ("RES")—the surviving company that at the close of the merger assumed IRUS's obligations and liabilities under the Merger Agreement—filed a Delaware certificate of merger announcing IRUS's merger into RES, which consolidated all RWE US employees under the same legal entity. A6695–96.

Notably, Trireme was familiar with these types of public filings and had even made similar filings to the same regulatory bodies prior to the close of the Merger Agreement. SPA63–65; A6750; A1318:1–19; A1568:21–A1569:5.

## IV. *Trireme I*: Cassadaga Lawsuit

Trireme commenced *Trireme I* on June 30, 2020, alleging that defendants (parties in privity with RWE US and RES) breached their obligation to exercise commercially reasonable efforts and their reporting requirements under the Merger Agreement. SPA88. Trireme filed an amended complaint on July 14, 2020, in which Trireme did *not* assert a claim for breach of Section 7.6(c). SPA88. In November and December 2020, RWE produced, among other things, organizational charts and related documents to Trireme in connection with a specific Aura project: the Cassadaga project. A7232–34; A7109–13. Notably, certain of these documents demonstrated that, for the purpose of tax-equity investment, RWE US would entirely replace IRUS in Cassadaga's ownership chain. A7109–13. With defendants'

15

consent, on January 13, 2021, Trireme amended the complaint a second time and added new claims of contract reformation, unjust enrichment, and tortious interference. SPA8; A7538. Notwithstanding the aforementioned documents Trireme received in discovery in late 2020, Trireme still did not assert a claim for breach of Section 7.6(c). SPA88.

Two weeks after fact discovery closed in *Trireme I*, and eighteen months after the deadline to move to amend pleadings, Trireme sought leave to file a third amended complaint to add a new claim for breach of Section 7.6(c) of the Merger Agreement on April 8, 2022. SPA90. The proposed third amended complaint was nearly identical to the initial complaint filed in the present lawsuit—*Trireme II*. *Id.* The district court (Caproni, J.) denied Trireme's motion for leave to amend due to lack of good cause, citing two bases: first, because Trireme delayed moving to amend after receiving notice of the potential breach; and second, because permitting amendment would be unduly prejudicial to defendants. SPA90–91; A130:2–A132:2.

As to notice, the district court explained that Trireme was on notice of a potential breach before filing their initial complaint due to public documents filed with the NYPSC (the state entity regulating the Cassadaga project) in May 2019, which showed that the Development Companies were outside of IRUS' control at that time. SPA90–91; A130:2–A132:2. Further, the district court stated that

16

Trireme was on notice early in the discovery period when: (i) defendants submitted organizational charts and documents in April 2020 and July 2021 showing that the Development Companies were outside of their control, and (ii) in September 2021, when a witness testified that the Development Companies were outside of IRUS' control.  SPA90–91; A130:2–A132:2.

In November 2023, the district court held a bench trial on Trireme's remaining claims for breach of the implied covenant of good faith and fair dealing and a breach of contract claim regarding certain information rights.  SPA91.  The district court entered judgment in favor of the defendants on December 14, 2023, finding that Trireme failed to prove that IRUS acted in bad faith to delay construction of the Cassadaga project for the purpose of depriving Trireme of the Milestone payment and also finding no breach of contract as to IRUS's reporting requirement. SPA91–92.

On January 12, 2024, Trireme filed a notice of appeal from the district court's post-trial Opinion and Order.  SPA92.  Trireme filed their opening brief in April 2024, arguing that the district court applied the wrong standard and failed to rely on relevant contemporaneous evidence as to the implied covenant claim.  SPA92. Trireme did not ultimately appeal the district court's denial of leave to amend.  *Id.* On May 13, 2025, this Court affirmed the district court's judgment and concluded that Trireme's arguments were without merit.  The Court found that the trial

evidence demonstrated that the district court specifically addressed the issues advanced by Trireme and made factual findings that were adequately supported by evidence at trial. *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 24-159-cv, (2d Cir. May 13, 2025), Dkt. 82.1.

## V. *Trireme II*: Present Lawsuit

Three weeks after the district court denied leave to amend in *Trireme I*, on August 31, 2022, Trireme filed this lawsuit asserting the same claim for breach of Section 7.6(c) of the Merger Agreement. A25. The action was reassigned to Judge Rochon as a related case on September 28, 2022. SPA92. Trireme filed an Amended Complaint on October 4, 2022, which added allegations that they had no reason to know about (and therefore include) the post-Asset Swap reorganization when they filed their operative complaint in *Trireme I* in January 2021. A43. Trireme corrected their *Trireme II* amended complaint on November 4, 2022, (A6705; SPA92), which is the operative complaint.

RWE asserted a motion to dismiss on the basis of claim-splitting, which the district court denied on August 24, 2023. A503. The district court found that, at the pleading stage, Trireme had met the low bar of alleging facts that plausibly support the application of an exception to claim-splitting, namely whether information about the post-Asset Swap reorganization had been fraudulently concealed from Trireme.

18

SPA92–93.  Discovery was therefore permitted to proceed on the factual question as to whether the exception to the rule applied.  *Id*.

The district court also denied Trireme's motion for partial judgment on the pleadings on January 16, 2024, finding that Section 7.6(c) was ambiguous and open to RWE's interpretation that the internal transfers of the Development Companies did not breach the Merger Agreement.  SPA93; A585.

Between October 7 and October 11, 2024, the district court held a five-day bench trial, after which the parties submitted updated post-trial findings of fact and conclusions of law.  SPA43–44.  The district court noted that *all* of Trireme's witnesses had direct financial interests in the outcome of this litigation, whereas *none* of RWE's witnesses did.  SPA45.  Following trial and post-trial submissions, the district court entered judgment in favor of RWE on November 20, 2024.  SPA44.  The district court found that: (i) *res judicata* barred Trireme's claims, (ii) Trireme had failed to show any exception to *res judicata* applied, and (iii) Trireme's claim separately failed on the merits because Trireme did not show that RWE's internal restructuring breached Section 7.6(c) of the Merger Agreement.  SPA44.  Trireme filed a notice of appeal on December 5, 2024, and their opening appellate brief on March 18, 2025.  A7772.

## SUMMARY OF THE ARGUMENT

**I.     Trireme's Sole Claim Is Barred by Res Judicata.**

*First*, Trireme's failure to appeal Judge Caproni's denial of its motion for leave to amend in *Trireme I* is the start and end of the *res judicata* inquiry (and the case).  In this Circuit, "[w]here a plaintiff's motion to amend its complaint in the first action is denied, and [the] plaintiff fails to appeal the denial, *res judicata* applies to the claims sought to be added in the proposed amended complaint."  *Home Team 668 LLC*, 2024 WL 4764000, at *3 (*quoting EFCO Corp.*, 124 F.3d at 399–400).  Here, Trireme had ample opportunity to appeal Judge Caproni's Order denying leave to add an identical claim, but did not do so.  Accordingly, "*res judicata* applies" to this claim.

*Second*, as the district court held, "the evidence shows that Trireme knew or should have known about the change in the Development Companies' ownership as of the filing of the operative complaint in *Trireme I* in January 2021."  SPA106.  This *factual* finding is amply supported by record evidence (public filings and documents produced *to Trireme* in discovery in *Trireme I*), and Trireme comes nowhere close to establishing that such finding is clearly erroneous.  Trireme's primary response—that *res judicata* applies only where a plaintiff has *actual* notice of a claim but nevertheless fails to assert it in prior litigation—is flatly contradicted by a long line of authority from this Court.  *See, e.g., L-Tec Elecs. Corp. v. Cougar*

*Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999) (*res judicata* applies where "facts and events themselves arose prior to the filing of the original complaint" but the plaintiff's "awareness of these facts" comes "later"). Trireme is simply wrong on the law.

For all these reasons, the district court's conclusion that *res judicata* bars Trireme's sole claim was correct as a matter of law, and this Court need not reach the merits to affirm.

## II. If This Court Opts to Reach the Merits, the District Court's Finding That RWE's Alleged Conduct Did Not Breach the Merger Agreement Should Be Affirmed.

*First*, the district court's holding that Section 7.6(c) of the Merger Agreement is ambiguous easily withstands *de novo* review. Citing prevailing New York case law, the district court found an ambiguity because (among other reasons): (i) Trireme's reading of Section 7.6(c) would lead to a commercially unreasonable result, (ii) Trireme's reading of Section 7.6(c) does not comport with the Merger Agreement as a whole, and (iii) the plain language of Section 7.6(c) omits a material term: it does not say to whom it restricts sales and disposals. Each of these is a well-recognized basis to find an ambiguity, and the district court correctly applied the law to find an ambiguity here.

21

*Second*, the district court's conclusion that the extrinsic evidence supports RWE's reading of Section 7.6(c) over Trireme's is not clearly erroneous. To the extent the district court's conclusion was based on its assessment of witness credibility—and, in large part, it was—that finding is virtually unreviewable. *See In Time Prods., Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 665 (2d Cir. 1994) ("assessments of witness credibility . . . not contradicted by extrinsic evidence . . . can ***virtually never*** be clear error") (emphasis added) (cleaned up) (citation omitted). And the district court's assessment of the evidentiary record is well supported—including by documents created by *Trireme's* counsel. That Trireme points to evidence cutting the other way "does not mean that the findings made are clearly erroneous." *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 24-159-cv, 2025 WL 1374732, at *1 (2d Cir. May 13, 2025) (citation omitted).

## STANDARD OF REVIEW

"On appeal from a bench trial, the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*." *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 67 (2d Cir. 1999). Trireme glosses over the applicable standard and suggests that the issues in this case are predominantly legal. *See* Appellants' Br. 26-27. In reality, though, the issues on appeal have significant factual and legal components, with many critical issues subject only to deferential clear error review.

22

With respect to the district court's conclusion that Trireme's claim in this case is precluded by the *Trireme I* litigation, it is true that this Court reviews the "district court's application of the principles of *res judicata . . . de novo*," *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 368 (2d Cir. 1997), but the Court must also "accept[] all factual findings of the district court unless clearly erroneous," *id.* at 369. Here, there is an important factual question that bears on the *res judicata* analysis: whether Trireme could have discovered RWE's internal reorganization through due diligence prior to filing the operative complaint in *Trireme I*. The district court's finding that Trireme *could* have discovered the internal reorganization through due diligence is reviewed for clear error. *See Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) ("Because the inquiry into when a factual predicate could have been discovered with due diligence is, by definition, a question of fact, we review the District Court's determination for clear error."). The same is true for the district court's finding that RWE did not fraudulently conceal its internal reorganization. *See Garza v. U.S. Bureau of Prisons*, 284 F.3d 930, 937 (8th Cir. 2002) ("[W]e do not find the district court's factual findings regarding the Estate's allegations of fraudulent concealment to be clearly erroneous.").

Moving to the district court's determination that RWE did not breach Section 7.6(c) of the Merger Agreement, the district court's conclusion that Section 7.6(c) is ambiguous is reviewed *de novo*. *See Orchard Hill Master Fund Ltd. v. SBA*

23

*Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016). Given that the district court held the provision to be ambiguous, though, its finding that the extrinsic evidence favored RWE's interpretation is reviewed for clear error. *See Toy Biz, Inc.*, 38 F.3d at 665 ("The court's findings as to the meaning of such a provision are findings of fact that may not be disturbed unless they are clearly erroneous."). Moreover, assessments of witness credibility are nearly inviolable, as "assessments of witness credibility are peculiarly within the province of the trier of fact, and '[w]hen a trial judge's finding is based on [her] decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, ***can virtually never be clear error***.'" *Id.* (emphasis added) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

As a final point, Trireme quotes *Beck Chevrolet Co. v. General Motors LLC*, 787 F.3d 663, 672 (2d Cir. 2015), for the proposition that mixed questions of law and fact are reviewed *de novo*. *See* Appellants' Br. 26–27. That misstates the law. In *U.S. Bank National Ass'n v. Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018), the Supreme Court held that "the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work." *See also, e.g.*, *Bufkin v. Collins*, 145 S. Ct. 728, 739 (2025) (same).

24

**ARGUMENT**

## I. The District Court Correctly Held That Trireme's Suit Is Barred by the Doctrine of *Res Judicata*

"*Res judicata* is a rule of fundamental repose important for both the litigants and for society." *EDP Med. Comput. Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (alterations and citation omitted). "It relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication." *Id.* (cleaned up) (citation omitted). *Res judicata* is also a mandatory rule and not subject to equitable considerations. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) ("There is simply 'no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res* judicata.'"). Under the doctrine, parties are precluded from relitigating issues where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (cleaned up) (citation omitted).

Trireme does not dispute that *Trireme I* involved both "an adjudication on the merits" and "the plaintiffs or those in privity with them." Instead, Trireme argues that the claim it asserts in this case—that RWE breached Section 7.6(c)—could not have been raised in *Trireme I*. Appellants' Br. at 23.

25

As a general rule, when a plaintiff's claims "arise from the same transaction or occurrence" as a prior action, "*[r]es judicata* applies even where [the] new claims are based on newly discovered evidence." *L-Tec Elecs. Corp.*, 198 F.3d at 88.[1] There are exceptions to this rule, however, "when the evidence was either fraudulently concealed or when it could not have been discovered with due diligence." *Saud v. Bank of N.Y.*, 929 F.2d 916, 920 (2d Cir. 1991). Trireme argues that these exceptions apply here. As the district court found, however—and as explained further in Section I.B, *infra*—there was ample evidence, discoverable through due diligence, that would have put Trireme on notice of its claim under Section 7.6(c).

Trireme is also barred from bringing this suit for another reason: Trireme failed to appeal from the district court's denial in *Trireme I* of its motion for leave to amend to add a claim for breach of Section 7.6(c). *See EFCO Corp.*, 124 F.3d at 399–400. This Court could affirm the judgment below on that ground, regardless of whether it decides to address the issue of whether Trireme could have discovered the evidence underlying its Section 7.6(c) claim through the exercise of due diligence. *See Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 100 (2d Cir. 2022)

---

[1] "It is well-settled that multiple claims based upon a single contract are considered part of the same transaction." *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 564 (S.D.N.Y. 2016), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016). Trireme does not dispute this "well-settled" rule.

(this Court "may affirm on any ground with support in the record, including grounds upon which the district court did not rely" (alterations and citations omitted)).

### A. Trireme's Suit Is Barred by Its Failure to Appeal the Denial of Leave to Amend Its Complaint in *Trireme I*

Trireme filed its complaint in this case after the district court denied its motion for leave to amend in *Trireme I* to add a substantively identical claim for breach of Section 7.6(c). *Compare* A32–33, *with* Proposed Third Amended Complaint ¶¶ 204–10, *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 1:20-cv-05015 (S.D.N.Y. Apr. 8, 2022), Dkt. No. 150-1. Trireme initially indicated that it might seek review of the district court's denial of leave to amend in *Trireme I*. *See* Civil Appeal Pre-Argument Statement (Form C), *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 24-159 (2d Cir. Jan. 26, 2024), Dkt. No. 7.1 at 187. When it filed its opening brief in the *Trireme I* appeal, however, Trireme abandoned any challenge to the district court's denial of leave. *See* Brief and Special Appendix for Plaintiffs-Appellants, *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 24-159 (2d Cir. Apr. 26, 2024), Dkt. No. 53.1.

Because Trireme failed to challenge the district court's denial of leave to add a claim for breach of Section 7.6(c), it is precluded from bringing a subsequent suit raising the same claim. This Court has made clear that "[w]here a plaintiff's motion to amend its complaint in the first action is denied, and plaintiff fails to appeal the denial, *res judicata* applies to the claims sought to be added in the proposed amended

27

complaint." *EFCO Corp.*, 124 F.3d at 399-400 (citing Restatement (Second) of Judgments § 25 cmt. B (Am. L. Inst. 1982) ("With respect to a court's refusal in the first action to allow late amendment, the plaintiff, if aggrieved, would be expected to pursue any right of appeal within that action.")); *see also Home Team 668 LLC*, 2024 WL 4764000, at *3 (applying *res judicata* to bar claims that were the subject of an un-appealed denial of an application to amend, and citing *EFCO Corp.*).[2] Trireme had an opportunity to assert its claim for breach of Section 7.6(c), and that opportunity required it to appeal the district court's denial of leave in *Trireme I*. Because Trireme abandoned its appeal of that issue, it cannot reassert the claim in this lawsuit.[3]

---

[2] Although it was not a primary basis for the district court's ruling, the district court acknowledged this additional basis for applying *res judicata* and finding "no grave injustice" in that ruling. SPA97.

[3] In fact, this rule is more plaintiff-friendly than the rule in many other Circuits where, as a categorical matter, "denial of leave to amend constitutes *res judicata* on the merits of the claims which were the subject of the proposed amended pleading." *King v. Hoover Grp. Inc.*, 958 F.2d 219, 222–23 (8th Cir. 1992); *see Christman v. Saint Lucie County*, 509 F. App'x 878, 879 (11th Cir. 2013) (per curiam) (same). As the Seventh Circuit explained in holding that a second lawsuit was precluded after the plaintiff filed an untimely motion for leave to amend in an initial lawsuit, "to proceed here would result in the very prejudice and inefficiency that the denial of the untimely amendment . . . was intended to avoid." *Arrigo v. Link*, 836 F.3d 787, 800 (7th Cir. 2016).

## B. RWE's Internal Reorganization Could Have Been Discovered Through the Exercise of Due Diligence

i. The District Court Correctly Found that Trireme Could Have Discovered the Evidence Underlying Its Section 7.6(c) Claim.

The district court's factual findings on diligence and notice have ample evidentiary support. As noted above, the district court's finding that Trireme could have discovered RWE's internal reorganization through the exercise of due diligence is reviewed for clear error. *See Rivas*, 687 F.3d at 535. Crucially, when reviewing for clear error, this Court applies a "deferential" standard and is "not allowed to second-guess either the trial court's credibility assessments or its choice between permissible competing inferences." *Principal Nat'l Life Ins. Co. v. Coassin*, 884 F.3d 130, 138 (2d Cir. 2018) (citation omitted). Indeed, this Court "may not reverse [a finding] even though convinced that had [it] been sitting as the trier of fact, [it] would have weighed the evidence differently." *Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53, 63 (2d Cir. 2019) (citation omitted).

And, here, the district court's decision found ample support in the trial record, including in the testimony of witnesses whose credibility the district court was uniquely positioned to assess. *See Toy Biz, Inc.*, 38 F.3d at 665. As the district court recognized, the following evidence demonstrated that Trireme could have discovered the facts underlying its Section 7.6(c) claim prior to filing its operative complaint in *Trireme I*:

*2019 FERC Filing*:  On May 7, 2019, RWE AG, E.ON and others filed a public application with FERC that "provided a comprehensive overview of the structure of the Asset Swap and the various transaction steps involved therein," and that "incorporated pre- and post-transaction organizational charts setting forth organizational structures within the respective entities prior to and following the Asset Swap."  SPA73.  As relevant, in the pre-transaction organizational chart, the Development Companies appeared under IRUS subsidiaries as "non-jurisdictional" assets.  SPA74 (alterations omitted); *see also* A1571 (Spencer trial testimony that non-jurisdictional assets were "assets not subject to FERC jurisdiction, which I can infer are the development companies.").  In the post-transaction chart, by contrast, IRUS had no "direct subsidiaries or non-jurisdictional assets."  SPA74.  As the district court explained, the movement of the non-jurisdictional assets between the two charts was "sufficient to put Trireme on notice that IRUS may not retain an ownership interest in the Development Companies post–Asset Swap."  SPA98.

*2019 NYPSC Filing*:  On May 30, 2019, RWE AG, E.ON and others submitted a second public filing to the NYPSC.  SPA74.  The filing contained "the same pre- and post-closing organizational charts as incorporated in the FERC filing, which reflected IRUS no longer holding the Development Companies post-transaction."  *Id.*  For the reasons just discussed, those charts were sufficient to put Trireme on notice of the facts underlying its Section 7.6(c) claim.  SPA98.  Furthermore, as the

30

district court noted, the filing "was substantially similar in form to the [NYPSC] request jointly filed by IRUS and Trireme in advance of IRUS's acquisition of the Development Companies." SPA74. Trireme was thus familiar with the NYPSC filing process and could easily have discovered the charts if it had decided to look.

*2020 Certificate of Merger*: On December 18, 2020, RES filed a certificate of merger with the Delaware Secretary of State indicating that IRUS and RES would merge on December 31, 2020, and that RES would be the surviving company. A6695-96. As the district court explained, "[t]his was sufficient to put Plaintiffs on notice that IRUS, which was not the surviving company after the merger, would not continue to own the Development Companies." SPA99. And as with the NYPSC, Trireme would have been familiar with Delaware's filing process, because Trireme had filed a certificate of merger there in 2018 in connection with the Merger Agreement between Trireme and IRUS. SPA65.

*2020 Production of Tax-Equity Agreement*: In November 2020, during discovery in *Trireme I*, IRUS produced a tax-equity financing agreement that showed RWE would replace IRUS as the sponsor of the Cassadaga project. SPA89; *see* A7113–64. The agreement made clear that the sponsor (RWE US) would own all of the equity in a company called Cassadaga Class B Holdings LLC, which in turn would own all of the equity in a company called Cassadaga Wind Holdings LLC, which in turn would own all of the equity in Cassadaga Wind LLC: the

31

Development Company holding the assets for the Cassadaga project. A7113–14. As the district court explained, the agreement thus "show[ed] that IRUS was removed from Cassadaga's ownership chain altogether." SPA89. And because Cassadaga Wind LLC was one of the Development Companies covered by Section 7.6(c) of the Merger Agreement, A2936, Trireme thus received direct notice of a potential breach once it received a copy of the agreement, SPA99–100.

Based on this evidence, the district court concluded that Trireme could have discovered the facts underlying its Section 7.6(c) claim well before it filed the operative complaint in *Trireme I*. Indeed, each of the documents above was either publicly available or produced to Trireme's attorneys during litigation. *See In re Layo*, 460 F.3d 289, 293 (2d Cir. 2006) (checking public records "is the most basic type of due diligence[]"); *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("In general, when an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, . . . the agent's knowledge is imputed to the principal."). There is no reason *not* to charge Trireme with notice of their contents.

## ii. Trireme's Arguments to the Contrary Are Wrong.

Trireme essentially has three responses. First, it avers that none of the above evidence matters because—supposedly—*res judicata* does not apply unless "the plaintiff has actual notice of [at least some of] the facts underlying its claim" and

nevertheless fails to bring the claim in the earlier action. Appellants' Br. 28; *see id.* at 28–31, 34–36. Second, Trireme says that the above-cited evidence wasn't illuminating *enough* to provide notice of a claim. Third, Trireme identifies contrary evidence from the record—an organizational chart, a different FERC filing, and an inference drawn from a statement in IRUS's operative Answer in *Trireme I*—and argues that this evidence ought to trump the evidence relied on by the district court. None of these tacks succeeds.

Beginning with the legal standard, contrary to Trireme's reimagining of civil procedure, it is bedrock doctrine that a plaintiff does *not* need to have actual notice of the facts underlying its claim in order for *res judicata* to apply. This Court's decision in *L-Tec Electronics* is instructive. There, this Court applied *res judicata* to bar new claims even though, undisputedly, the plaintiff lacked any knowledge of the facts underlying the new claims at the time of the original complaint.

Specifically, the L-Tec plaintiff had delivered certain electronic goods to a defendant corporation while it was temporarily dissolved by the New York Secretary of State—having been dissolved, the defendant corporation did not pay. *See L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 86 (2d Cir. 1999) (per curiam). Once the defendant corporation was back in good standing, L-Tec sued both the corporation and its "principal officers" as individual defendants. *Id.* The trial court granted the individual defendants' motion for summary judgment, holding that under

33

New York law, individuals are not liable for actions or omissions undertaken in the name of a dissolved corporation, but allowed the action against the corporate defendant to proceed. *Id.*

Then "[s]hortly after dismissal of L–Tec's claims against the individual defendants, counsel for L–Tec became aware of facts" allegedly demonstrating that the individual defendants "had been transacting business through an unincorporated entity" during the dissolution and could be sued in that capacity. *Id.* But this Court readily affirmed the district court's finding that this new attack on the individual defendants is precluded by *res judicata*. *Id.* at 88 (the new claims are "are plainly barred by *res judicata*"). This Court made that ruling despite the undisputed fact that "L–Tec's awareness" of the unincorporated entity came after the original complaint, because L-Tec "could have ascertained this information through due diligence" prior to the original complaint, "including pre-filing investigation." *Id.* Thus, *res judicata* applied despite a lack of actual notice.

Trireme's hairsplitting answer—that *L-Tec*'s holding only applies where a plaintiff belatedly uncovers facts to support a claim that it tried and failed to assert earlier, but not "facts underlying brand new claims," Appellants' Br. at 36—fails on both the law and the facts. Trireme cites zero authority in support of this distinction, nor can it explain how such a distinction could be squared with the rule that *res judicata* applies, *even for newly discovered evidence*, unless that evidence was

34

concealed by fraud or could not have been discovered through the exercise of due diligence. *See Cho v. Blackberry Ltd.*, 991 F.3d 155, 168 (2d Cir. 2021); *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695 (2d Cir. 2011); *L-Tec Elecs.*, 198 F.3d at 88; *Saud*, 929 F.2d at 920.

And, as a factual matter, Trireme's theory that the Asset Swap (or something related to it) somehow breached Section 7.6(c) was not "brand new" in any meaningful sense. Much like in *L-Tec*, the record shows that Trireme made earlier efforts to cook up a claim for breach of the Merger Agreement flowing from the Asset Swap but was unsuccessful. *See e.g.*, A6510; A1501:10-A1502:1; A1614:16-A1616:9. *Res judicata* thus bars this attempt to sue, even under Trireme's invented standard.

Indeed, although Trireme tries to distinguish this Court's decision in *Saud* — which it describes as "seminal," (Appellants' Br. at 28)—that decision supports the application of *res judicata* here. There, although the plaintiff "long suspected" that he may have a claim for fraud against the Bank of New York, he failed to conduct diligence and did not learn of critical facts, including that a Bank of New York executive had been "convicted of bribery," until too late to assert the fraud claim in a prior action. *Saud*, 929 F.2d at 920. Notwithstanding the plaintiff's lack of actual knowledge of these facts, this Court still applied *res judicata*, finding the plaintiff

35

"chargeable with full knowledge of the fraud[]" which he would have discovered had he undertaken the appropriate diligence.[4]  *Id*. at 921-22.

Next, Trireme makes various arguments suggesting that the evidence the District Court relied upon would not have provided notice.  Appellants' Br. 30-33. As a threshold point, this type of inquiry—re-evaluating and weighing evidence that the district considered and ruled upon in the first instance—is improper on clear error review.  *See Anderson*, 470 U.S. at 576 (reversing a finding of clear error where "the Fourth Circuit improperly conducted what amounted to a *de novo* weighing of the evidence in the record[]").  And even if this inquiry were proper, Trireme's arguments fail on their merits.

First, Trireme argues that the 2019 FERC and NYPSC filings could not have put it on notice because those filings were made before RWE planned its internal reorganization.  *See* Appellants' Br. 31–32.  As the district court explained, however, "[t]here was enough information in the public filings to engender a 'suspicion[]' that the Development Companies would be transferred, even if the exact chain of ownership post-close was not detailed."  SPA98 (quoting *Caron v. TD Ameritrade*, No. 19-cv-9015 (AJN), 2020 WL 7027593, at *6 (S.D.N.Y. Nov. 30, 2020)).  The

---

[4] Trireme is of course correct that in *some* cases where *res judicata* is applied, the plaintiff *did* have actual knowledge of some part of the claim it failed to assert earlier.  But there is no case holding that such knowledge is a prerequisite to the application of *res judicata* (because that is not the law).

36

pre- and post-transaction charts in the 2019 FERC and NYPSC filings showed that IRUS would not retain ownership of the Development Companies, and had Trireme been diligent, it would have investigated the matter further. *See L-Tec Elecs.*, 198 F.3d at 88 (describing plaintiff's duty to investigate to avoid the application of *res judicata*); *Saud*, 929 F.2d at 921 (same) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." (alterations omitted))). Indeed, Mr. Spencer acknowledged at trial that he understood the non-jurisdictional assets in the 2019 FERC and NYPSC transaction charts—which appeared under IRUS pre-transaction but not post-transaction—to be the Development Companies. A1571.

As for the 2020 Delaware certificate of merger, Trireme argues that it had no "obligation to monitor corporate filings in Delaware," and that, "[i]n any event, the Merger Agreement did not prohibit IRUS from merging with another company[.]" Appellants' Br. 33. As the district court explained, though, "[e]ven if successors were contemplated by the Merger Agreement, Plaintiffs, sophisticated entities familiar with M&A in the renewable-energy sector, should have anticipated that given that RES was the surviving entity of the merger, IRUS's assets would

37

necessarily be restructured under RES such that further inquiry was warranted." SPA99. Trireme's concession regarding mergers, moreover, underscores the empty formalism of its interpretation of Section 7.6(c): it would not have violated Section 7.6(c) for IRUS to merge into an RWE subsidiary that thereby became the ultimate owner of the Development Companies. Yet, it *would* have violated 7.6(c), though—to the tune of $112 million—for IRUS to first reallocate the Development Companies to the RWE subsidiary and only then complete the merger.[5]

Finally, with respect to the Cassadaga tax-equity financing agreement, Trireme argues that "neither Trireme nor RWE identified it as a document bearing on Trireme's 7.6(c) cause of action until the eve of trial." Appellants' Br. 34. Again, the district court rebutted this point: "Plaintiffs, not Defendants, are seeking to invoke an exception to the otherwise mandatory *res judicata* rule, and Plaintiffs, not Defendants, are expected to actively litigate their claims." SPA100 n.17. Whether and when RWE identified a document after it was produced during litigation has nothing to do with whether Trireme could have uncovered that document through the exercise of due diligence prior to filing its operative complaint in *Trireme I*.

---

[5] It is immaterial that defendants said in their Amended Answer in *Trireme I* that IRUS was owned by a chain of LLCs. *See* Appellants' Br. 33. The 2020 certificate of merger—particularly when taken together with the 2019 FERC and NYPSC filings—would nevertheless have revealed the possibility that the Development Companies formerly sitting under IRUS had been reorganized.

38

Accordingly, Trireme's objection to the tax-equity financing agreement—which, again, showed that RWE would replace IRUS as the sponsor of the Cassadaga project—is irrelevant.

Last, moving to the identified contrary evidence, Trireme points to a few documents in the record which it argues indicated that the Development Companies would *not* be transferred from one RWE subsidiary to another, thus undercutting an inference that Trireme was on notice of its claim in time to assert it in *Trireme I.* These are:

- a June 2020 FERC filing in which IRUS stated that Cassadaga Wind LLC would "continue to be an indirect subsidiary of [IRUS]" following the Asset Swap. Appellants' Br. 32.

- An undated, untitled organizational chart which showed "Innogy Subsidiaries" sitting below IRUS in a corporate structure, allegedly supporting the inference that IRUS would continue to hold the Development Companies for some undefined period of time. Appellants' Br. 14.

- An excerpt from IRUS's Amended Answer in *Trireme I.*

Even assuming that Trireme's characterizations of this evidence is correct, it is not the role of this Court to dive back into the record and consider whether this evidence outweighs the evidence relied upon by the district court when reviewing for clear error. All of this evidence was presented to the district court, which weighed the evidence and held that Trireme was on notice in time to assert its claim (just as Judge Caproni held back in 2022, *supra* p. 16.) On clear error review, this Court does not conduct the "reweighing" that Trireme requests. *Supra* p. 36. And

39

the evidence that Trireme identifies was not misleading, much less misleading enough to render the district court's determination of Trireme's notice clearly erroneous.

*First,* the statements in the June 2020 FERC filing were focused on the change in the Cassadaga project's ultimate ownership, not its intermediary ownership. *See* A4646–51. And in any event, the filing spoke only to the ownership of the Cassadaga project; it said nothing about the other Development Companies that the earlier FERC and NYPSC filings had shown would no longer sit under IRUS.

*Second*, on the undated organizational chart, the district court correctly noted that "the context in which [the chart] was provided [was] important: Trireme had sought additional information to better assess IRUS's proposal to substitute RWE AG as the parent company guarantor" as part of the Asset Swap closing. SPA105. Furthermore, the district court noted, the term "Innogy Subsidiaries" in the chart was not defined, and Mr. Spencer conceded that he did not ask for further information. SPA80. In light of this evidence, it was correct—and certainly not clearly erroneous—for the district court to find that this chart did not mislead Trireme. *See* SPA104–105.[6] Trireme's response that the chart pertained to "matters peculiarly within the other party's knowledge" and so it may "rely on [the chart] without further

---

[6] Trireme abandons altogether its argument regarding Mr. Young's purported verbal assurances to Mr. Spencer, which the district court rejected below. *See* SPA104–05.

investigation" misses the mark. Appellants' Br. 37 (quoting *Merrill Lynch & Co. v. Allegheny Energy*, *Inc.*, 500 F.3d 171, 181 (2d Cir. 2007)). As the district court rightly noted, Trireme cites inapposite fraud cases for this point, not cases concerning *res judicata*. SPA102. And, it is not accurate that the details of RWE's internal reorganization were "peculiarly" in its knowledge for the whole relevant period. Once the Asset Swap closed, public filings (such as the Delaware certificate of merger) and *documents produced to Trireme* in litigation revealed that ownership of the Development Companies would change. A6695-96; A7109-11; A7113-14.

*Third*, Trireme's reliance on IRUS's Amended Answer in *Trireme I*, which admitted the allegation that "IRUS is a Delaware LLC" when in fact IRUS no longer existed at the time of filing, does not move the needle. Indeed, Trireme itself argued that the Delaware certificate of merger—which stated that IRUS no longer exists— was not sufficient to provide notice. Appellants' Br. at 33. So even if the Answer (which was intended, at least as to allegations about the identities of the parties, to relate back to events at the time *Trireme I* was commenced) had indicated that IRUS no longer existed, Trireme claims it would have gleaned nothing relevant from that additional information. In any event, the law is clear that a party's "utter failure to" investigate relevant facts "can not be justified by any of the alleged statements of [its litigation adversary]." *Phoenix Canada Oil Co. v. Texaco Inc.*, 749 F. Supp. 525, 530 (S.D.N.Y. 1990). And even if that were not the law, this single snippet

from an Answer—that Trireme does not even claim it reviewed—does not render the district court's finding clearly erroneous.

*** 

As early as May 2019, Trireme knew that it might have a Section 7.6(c) claim in connection with the Asset Swap. It conducted legal analysis and determined that it had no claim, presumably because a change in ownership of IRUS would not entail a sale or assignment of IRUS's assets. As the district court explained, however, it is common for companies to undergo internal reorganizations during transactions like the Asset Swap, SPA84, and Trireme thus would have "had a strong incentive," *Saud*, 929 F.2d at 921-22, to investigate and scrutinize any filings—and particularly any documents it received during discovery—that bore on the organization of IRUS's subsidiaries. Trireme knew, moreover, how to file documents with the NYPSC and Delaware Secretary of State, having done so itself in connection with the Merger Agreement. Had it conducted an adequate pre-filing investigation, *see L-Tec Elecs.*, 198 F.3d at 88, it would have discovered the facts underlying its claims.

## II. The District Court Correctly Held that RWE's Internal Reorganization Did Not Violate Section 7.6(c)

Under New York law, the elements of a breach of contract claim are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). The central question here is whether RWE breached

42

Section 7.6(c) of the Merger Agreement by reassigning the Development Companies from IRUS to other RWE subsidiaries.

"When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations omitted) (citation omitted). When, however, a contract's terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business[,]" the contract is ambiguous. *Id.* (citation omitted). As discussed below, the district court correctly held that Section 7.6(c) was ambiguous as to whether it applied only to transactions with unaffiliated third parties or to internal reorganizations as well. If a contractual provision is ambiguous, "then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). Here, the district court correctly found based on documentary and testimonial evidence that Section 7.6(c) was intended to apply only to transactions with unaffiliated third parties, and that RWE's internal reorganization therefore did not breach the provision. This Court reviews that decision for clear error. *See Toy Biz, Inc.*, 38 F.3d at 665.

43

**A. The District Court Correctly Held that Section 7.6(c) Is Ambiguous.**

The district court found Section 7.6(c) to be ambiguous for three interrelated reasons, all of which easily survive even *de novo* review. *First*, and foremost, the district court correctly found an ambiguity because "the necessary result of a literal reading of Section 7.6(c)'s terms" would lead to an outcome that is "absurd [and] not commercially reasonable[;]" namely, a "windfall to [Trireme]" even though RWE's alleged conduct did not "impact . . . Trireme's rights under the contract." SPA113; SPA122-23.

This holding necessarily follows from the case law's repeated admonishment that "courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical." *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 392 (S.D.N.Y. 2023) (quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015); *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) ("Put otherwise, a 'contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties'") (citation omitted). Trireme's argument that the district court is slavishly bound to the literal dictionary definitions of terms, even where an absurd result

would follow, would do violence to this "black-letter" principle of contract construction. *Cambridge Cap.*, 675 F. Supp. 3d at 392.[7]

And contrary to Trireme's protests, courts applying New York law routinely find ambiguity where, as here, a reading that is arguably more faithful to the plain text would lead to an absurd or commercially unreasonable result. Judge Abrams' decision in *RCJV Holdings, Inc. v. Collado Ryerson. S.A. de C.V.*, to which the district court understandably cited heavily, is on all fours with this case. 18 F. Supp. 3d 534 (S.D.N.Y. 2014). That case concerned the interpretation of the term "the date hereof" in a promissory note: the defendant argued that "the date hereof" referred to the effective date of the note itself, whereas the plaintiff argued that "the date hereof" actually referred to the effective date of a *different contract* entirely. *Id.* at 544. And Judge Abrams conceded that the first reading (that "hereof" refers to the note where that "self-referential word" is written) "finds support in the literal text" and that, had the parties wanted to refer to a different contract, "they could

---

[7] Ironically, a slavishly literal reading of Section 7.6(c) would *also* result in a judgment in RWE's favor. Section 7.6(c) restricts "Purchaser"—which is defined in the Merger Agreement as IRUS (not IRUS, plus any subsidiaries)—from affecting a sale, transfer, assignment, or other disposal of the Development Companies. A2860; A2906. But the record shows that IRUS did not transfer or assign anything. Rather, the assignments that form the basis of Trireme's claim were conducted by IRUS *subsidiaries*, who are not bound by Section 7.6(c). A4316-21; A6653-54; SPA86. Thus, a formalistically literal reading of the contract (which is not what New York law requires) would also lead to a finding of "no breach" by the only party subject to the restrictions in Section 7.6(c): IRUS.

45

have chosen the word 'thereof'" instead.  *Id.* at 543-44.  Still, the court found the term "the date hereof" to be ambiguous because, if interpreted literally, the payment schedule contemplated by the note would almost never be operable, which would be "commercially unreasonable" and "absurd" in light of the circumstances.  *Id.* at 545.

As the district court put it, "[s]o too here."  SPA112.  Even if the literal dictionary definition of "assignment" in Section 7.6(c) might encompass an internal reorganization, such a literal reading would lead to a commercially unreasonable and absurd result—again, a windfall to Trireme despite the fact that Trireme has continued to seek and collect Milestone payments under the Merger Agreement and has not otherwise experienced any adverse impact to its contractual rights. Trireme's attempt to distinguish *RCJV* proves too much.  Trireme admits, as it must, that *RCJV* found an ambiguity despite apparently *un*ambiguous plain text but says that the case does not stand for a "general rule" that commercially unreasonable terms are *always* ambiguous.  Appellants' Br. 46 n.8.  But what Trireme misses is the general rule that *RCJV* <u>did</u> invoke and affirm: that "[a] contract should not be interpreted to produce a result that is absurd [or] commercially unreasonable[.]" *RCJV Holdings, Inc.*, 18 F. Supp. 3d at 545 (citation omitted).  In light of that rule, courts must reject plain language that leads to an absurd result *either* by finding an ambiguity and providing the parties an opportunity to present extrinsic evidence (as in *RCJV* and other cases discussed below) *or* by simply rejecting the unreasonable

46

interpretation in favor of a more reasonable, but less textually grounded, interpretation without resort to extrinsic evidence at all. *See Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1165 (2d Cir. 2024) (courts may simply reject a "construction" of a provision that would "produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties" without reliance on extrinsic evidence) (cleaned up); *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-cv-7134 (VM), 2015 WL 4940126, at *12 (S.D.N.Y. Aug. 10, 2015) (adopting defendant's reading of an agreement, despite apparent ambiguity and without extrinsic evidence, where plaintiff's reading would lead to "a result that is absurd and/or commercially unreasonable" and "[defendant's] interpretation is the only 'reasonable' reading of the relevant terms of the Agreement[]").

That the district court gave Trireme an opportunity to present extrinsic evidence in favor of its interpretation is not reversible error and Trireme cites no case holding that it is.[8]

---

[8] In fact, the district court easily could have, on this record, rejected Trireme's reading of Section 7.6(c) on its face, given the absurdity that would result from Trireme's proffered reading. *See, e.g.*, *Atlas Partners LLC*, 2015 WL 4940126, at *12. This Court could do the same. *Jusino*, 54 F.4th at 100 (this Court "may affirm on any ground with support in the record, including grounds upon which the district court did not rely") (alterations and citations omitted).

Further New York authorities are in line with *RCJV* and the district court in finding ambiguity when faced with plain text leading to an absurd result. In *Professional Fighters League, LLC v. Takeover Industries, Inc.*, ---F. Supp. 3d---, 24-cv-1335 (GS), 2025 WL 833873 (S.D.N.Y. Mar. 17, 2025), the court considered a contract that: (i) provided for defendant to pay plaintiff fees of roughly $1.4 million; and (ii) purported to limit defendant's liability for "ANY BREACH OF CONTRACT" to about $280,000, well below the value of the fees provided for. *Id.* at *1-2. Plaintiff sued when defendant failed to pay the agreed-upon $1.4 million in fees, and defendant retorted that its liability was limited to $280,000. *Id.*

The court in that case conceded that, "to be sure, the provision's plain meaning weighs in favor of [defendant]: on its face, [the] liability cap applies to *any* breach of contract claim[,]" but then held that, "[u]nder well-settled principles of New York law, however, the Court's inquiry cannot be so narrow." *Id.* at *4. Instead, the court considered the commercial impact of the plain language—allowing defendant to breach its obligation to pay $1.4 million "with impunity"—and found that such a result "can assuredly be described as absurd and the very opposite of what the parties likely intended." *Id.* at *5. Accordingly, the court held that the liability cap is "ambiguous as applied" and provided defendant an opportunity to present extrinsic evidence in support of its interpretation. *Id.* at *8; *see also Zest Anchors, LLC v. Biomet 3i, LLC,* No. 1:23-cv-07232 (JLR), 2024 WL 4008164, at *8 (S.D.N.Y.

48

Aug. 30, 2024) (a trademark licensing agreement is ambiguous where the plain text seemed to exclude trademarks that were essential to the goals of the parties' agreement, which would be "contrary to the parties' intent and is commercially unreasonable[]").

The rule that follows from these cases (and others cited by the district court) is clear: because a contract cannot be interpreted to produce an absurd or commercially unreasonable result, courts reject apparently unambiguous plain language that leads to such impermissible outcomes, including by finding ambiguity in the text. One of the cases that *Trireme* cites endorses that rule. *See Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 547–48 (1995) (courts may reject apparent plain meaning "where some absurdity has been identified"). The district court applied this law to find ambiguity, and that decision should be affirmed.[9]

Trireme's theory—that courts may not consider commercial reasonableness *after* finding that a provision is ambiguous (*see* Appellants' Br. at 44)—is not supported by the cases Trireme cites. In some of those cases, no ambiguity is found

---

[9] Trireme bizarrely states that "The District Court did not hold that enforcing the plain language of the Merger Agreement would . . . lead to an 'absurd' result," yet that is exactly what the district court held. *See* SPA123 ("Allowing Plaintiffs to nevertheless invoke Section 7.6(c) in these circumstances would result in a windfall . . . that is absurd, not commercially reasonable and contrary to the express terms of the agreement and thus the intent of the parties.").

because the court finds *no* absurd result flowing from the plain language.  In *Matter of Wallace v. 600 Partners Co.*, for example, the Court of Appeals found that an appraisal and rent adjustment process at the end of a 33-year commercial lease does "not create an absurd result," seemingly because it would not result in a windfall to either party or an evisceration of any party's contract rights.  *See Wallace*, 86 N.Y.2d at 548.  Finding no absurdity in the plain text, there was no basis to find an ambiguity. *Id.*

Same thing in *Jade Realty LLC v. Citigroup Commercial Mortgage Trust*.  20 N.Y.3d 881 (2012).  There, Citigroup obtained a lower prepayment penalty on a mortgage loan than it expected because the plain language of the loan documents "unconventional[ly]" provided for lower prepayment penalties at the beginning of the mortgage than at the end.  *Id.* at 884.  But, as the Court of Appeals noted, Citigroup still got fairly compensated: "Citigroup received 5.48% interest for the time it held the loan and it did not lose its principal, so it could hardly be said that there is economic absurdity[.]"  *Id.*  In the absence of absurdity or a windfall, there was no basis to find ambiguity.  These authorities are a far cry from the situation here where, if the Merger Agreement were interpreted in a formalistically literal

sense, Trireme would reap a $112 million windfall (at RWE's expense) despite no impact on Trireme's contractual rights.[10]

*Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*, 20 N.Y.3d 438 (2013) is also readily distinguishable. There, the party exercised its right under an options contract to purchase membership interests, then worth $33 million, at a strike price of just $1,000. *Id.* at 443. But that is the nature of an options contract—if an investment thesis prevails, the option holder may acquire something valuable at a very low price (but, of course, if the thesis fails, the option holder could suffer a major loss). In that context, the court found that the options contract was "not commercially unreasonable"—and the parties to that case both agreed the contract was unambiguous in any event. *Fundamental*, 20 N.Y.3d at 445; *see also id.* at 444 (the parties "agree that the parol evidence rule has no bearing on this case"). An options contract where risk is part and parcel of the agreement is

---

[10] *Law Debenture Trust*, which Trireme buries in a footnote, is another case in which there was no absurdity in the plain text and so no ambiguity. There, this Court found nothing commercial unreasonable about an Agreement's distinguishing between foreign issuers whose securities trade directly on U.S. exchanges and those whose securities trade only indirectly in the U.S., noting that "[f]oreign companies may trade their shares on a United States national stock exchange directly rather than through [indirectly], and hundreds do." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 472 (2d Cir. 2010).

obviously manifestly different from a hidden trigger to a $112 million windfall in a purchase agreement.[11]

Finally, the remaining cases that Trireme cites on pages 45-46 of its brief all support *RWE*. These authorities (*Greenwich Cap. Fin. Prods, Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010); *Cole v. Macklowe,* 99 A.D.3d 595, 596 (1st Dep't 2012); and *Mitchell v. Abrams*, 89 A.D.3d 621, 622 (1st Dep't 2011)) all *reject* plain textual readings of contracts as commercially unreasonable. Trireme cites these authorities as supposedly standing for a heightened standard—"a contractual interpretation is unenforceable only when it leads to 'absurd results' that threaten to 'leave [a] clause without meaning,'" Appellants' Br. at 45 —but that's not what the cases say. Although the court in *Greenwich Capital* found that the particular absurd result there *would* leave a provision without meaning, it does not (and nor does any other case) set forth a general rule that meaninglessness is a prerequisite to considering commercial reasonability. That rule does not exist.

*Second*, Trireme's reading of Section 7.6(c) does not comport with the agreement as a whole, as required under New York law. *See Postlewaite v.*

---

[11] The *Fundamental Long Term Care* opinion does contain a line of dicta—without any citation—stating that "an inquiry into commercial reasonableness is only warranted where a contract is ambiguous." 20 N.Y.3d at 445. This statement was completely accessory to the court's decision in that case, and in any event, is belied by numerous cases including *Wallace*, which Trireme cites. *Supra* pp. 49-51.

*McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract.").

Under Section 7.6(a), IRUS had "sole discretion" to abandon a project—thus precluding Trireme from receiving Milestone payments altogether—so long as IRUS "use[d] commercially reasonable efforts to" develop the project. A2906. And under 7.6(b), IRUS had an obligation to provide Trireme with certain information, but only on a limited basis. *See id.* (restricting Trireme to quarterly updates and requiring that Trireme keep its inquiries "to a reasonable level . . . and in any event no more than three inquiries per month[]"). Under Trireme's reading of Section 7.6(c), by contrast, Trireme had a veto right over IRUS's internal reorganizations— even though those reorganizations would not impact Trireme's ability to recover Milestone payments. Other features of the Merger Agreement further underscore that it would be absurd and unreasonable to read Section 7.6(c) as applying to RWE's internal reorganization, including that the Merger Agreement contains no restriction on a sale of IRUS as a whole, and that Innogy SE provided a parent company guarantee of IRUS's obligations. As the district court explained, in light of the broader contractual scheme, "[i]t defies common sense that the parties would have intended to restrict, at the time of contracting, an internal reorganization with no

53

measurable impact on either the Development Companies or Trireme's ability to recover earnout payments under the contract." SPA113.

Moreover, and as the district court recognized, Section 7.6(c) contains a threshold ambiguity because the provision imposes a restriction on IRUS's ability to "sell," "assign," "transfer," or "otherwise dispose of" the development projects, but it "does not clarify *to whom* IRUS is prohibited from selling, assigning, transferring, or otherwise disposing of the development projects." SPA110 (emphasis added). Although "silence does not equate to contractual ambiguity," *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 573 (2002), New York courts have held that "an omission as to a material issue can create an ambiguity[,]" *Hart v. Kinney Drugs, Inc.*, 888 N.Y.S.2d 297, 300 (3d Dep't 2009) (citing *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*, 2 N.Y.3d 495, 500 (2004)). And whether Section 7.6(c) applies to all dispositions or only to third party dispositions is certainly a material issue. Indeed, this Court has held contracts with similar silences regarding essential terms to be ambiguous under New York law. *See, e.g.*, *Rec. Club of Am., Inc. v. United Artists Recs., Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989) (silence about whether royalties should be paid quarterly); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (silence as to whether a grant of stock referred to restricted or unrestricted stock led to ambiguity).

To conclude, the district court relied upon three separate, well-recognized and independently sufficient bases to support its finding that Section 7.6(c) is ambiguous.  That finding should be affirmed.

### B. The District Court Correctly Found Based on Extrinsic Evidence that Section 7.6(c) Does Not Apply to Internal Reorganizations.

Having held that Section 7.6(c) was ambiguous, the district court found that RWE's interpretation of Section 7.6(c) was "supported by contemporaneous evidence of the parties' negotiations and the drafting history of Section 7.6(c); the parties' course of conduct; the structure and purpose of the Merger Agreement; and industry custom and practice."  SPA116.  This determination was correct, and at a minimum it was not clearly erroneous.  *See Toy Biz, Inc.*, 38 F.3d at 665.

Most critically, the district court relied on contemporaneous documentary evidence prepared by *Trireme's counsel* and sent to IRUS's counsel, indicating that during contract negotiations, even *Trireme* understood that the purpose of Section 7.6(c) was to address a potential "Sale of a Project" to a third party.  An example of such evidence—an "issues list" prepared by Trireme's counsel at Morgan Lewis and shared with IRUS's counsel at K&L Gates—is excerpted below.



**Confidential**
**MLB DRAFT 11/29/17**

**Project Aura – Merger Agreement**

**List of Material Issues**

| 10. | **Payment Milestone (§ 7.6)**<br><br>_Treatment of Sale of Project._ The Revised Draft provides that a Target Project cannot be sold unless an Approved Third Party Buyer assumes the obligation to pay the Payment Milestone Amount if the Payment Milestone is achieved. | Resolution: Approved Third Party Buyer concept to be removed. |
|---|---|---|

Trireme says this evidence is entitled to "virtually no weight" because it was "written by a junior lawyer late at night." Appellants' Br. 54 n.9. This argument is belied by testimony from Trireme's own witnesses that documents would not be sent from Morgan Lewis to IRUS's counsel (as this document was) without Trireme's 95% owner Terra Firma's review and approval. A1261:6-14; A1421:13-19. Far from being the late night scrawling of a lowly junior lawyer, the record reflects that this document was approved by Trireme and its majority owner.

By contrast, Trireme did not "present[] any competent evidence showing that the negotiating parties ever discussed that Section 7.6(c) would apply to internal reorganizations." SPA117. To make up for this gap, Trireme argues that the district court misconstrued the drafting history of the Merger Agreement because "[o]ver approximately two months, IRUS attempted to limit the plain language of Section 7.6(c) to direct it exclusively to 'third-party' sale transactions," and "[w]ith each turn of the Merger Agreement, . . . Trireme struck IRUS's proposed limiting language." Appellants' Br. 51. The point of the party's negotiations, though, was not whether Milestone payments would be triggered by all sales or only third party sales. It was

whether, in the event of a third party sale, the Milestone payment guarantee would travel with the sale or remain with IRUS. Indeed, as the district court explained, everything about the parties' negotiations regarding the language at issue "demonstrates that the parties contemplated one-off sales of the development projects to third parties, and drafted language to protect their respective interests in that eventuality." SPA119.

Trireme also disputes the district court's characterization that "the parties . . . only ever discussed Section 7.6(c) in reference to asset sales to third parties." Appellants' Br. 52 (quoting SPA117). But Trireme provides no evidence—and there is none—that the parties ever discussed Section 7.6(c) in the context of an internal restructuring. Given Trireme's complete failure to rebut the district court on this point, the court's findings are necessarily "plausible in light of the record viewed in its entirety[.]" *Anderson*, 470 U.S. at 574.

At bottom, Trireme's theory of Section 7.6(c) is that the provision was drafted to ensure that IRUS remained the owner of the Aura projects. *See, e.g.*, Appellants' Br. 46–47 ("Trireme wanted to ensure that the Development Companies remained with IRUS, a counterparty whom Trireme believed had the incentive and means to develop the projects in time to trigger the milestone payments."). At trial, however, the district court expressly found Trireme's witnesses not to be credible on this point. *See* SPA119–120.

The district court noted, for example, that Trireme director Mr. Brinklow testified that "at the time the Merger Agreement was executed, he did not know whether IRUS had development assets, how many employees IRUS had, or 'anything about [IRUS]'s financials.'" SPA120 (quoting A1442). And the district court observed that, "at the time of the merger's execution, IRUS had been in existence for less than a year, had not yet established any renewable-energy projects in the United States, and had no assets in development. *Id.* "Given all of this," the district court determined that it "simply d[id] not believe the testimony that Trireme and Terra Firma were focused on ensuring that the Development Companies remained at all times with IRUS in particular (as opposed to any other entity within the RWE corporate family)." *Id.* That finding, which is based on the district court's credibility determinations after hearing witness testimony, is not—and basically could never be—clearly erroneous. *See Toy Biz, Inc.*, 38 F.3d at 665 ("assessments of witness credibility . . . not contradicted by extrinsic evidence . . . can ***virtually never*** be clear error") (emphasis added) (citation omitted).

## III. Trireme Is Not Entitled to a Judgment

Even if this Court finds *both* that Trireme's claim is *not* barred by *res judicata and* that RWE breached the Merger Agreement, the appropriate course is to remand to the district court for further proceedings for decisions on open issues relating to damages. *See* SPA128 n.23 ("Because the Court finds that there was no breach of

58

Section 7.6(c), the Court does not reach the appropriate calculation of damages or address whether Section 7.6(c) constitutes an unenforceable penalty").  Trireme concedes as much.  Appellants' Br. 4 (requesting that this Court "remand for further proceedings").

## CONCLUSION

For the foregoing reasons, the district court's opinion should be affirmed in its entirety.

Dated: June 17, 2025        Respectfully submitted,

/s/ *Susan K. Leader*
Susan K. Leader
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Los Angeles, California 90067
Telephone: (310) 620-5700
Facsimile: (310) 620-2841
Email: susanleader@paulhastings.com

Paul C. Gross
Sara N. Bricker
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: paulgross@paulhastings.com
Email: sarabricker@paulhastings.com

Eli B. Richlin
WILSON SONSINI GOODRICH &
ROSATI Professional Corporation
1301 Avenue of the Americas, 40th
Floor New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: erichlin@wsgr.com

*Counsel for Defendants-Appellees*
*RWE Renewables Americas, LLC and*
*RWE Renewables Services, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 13,927 words, including the words contained in the graphics on pages 55-56, and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2013 in the Times New Roman font, size 14.

Dated: June 17, 2025     Respectfully submitted,

             */s/ Susan K. Leader*
             Susan K. Leader
             PAUL HASTINGS LLP
             1999 Avenue of the Stars, 27th Floor
             Los Angeles, California 90067
             Telephone: (310) 620-5700
             Facsimile: (310) 620-2841
             Email: susanleader@paulhastings.com

Paul C. Gross
Sara N. Bricker
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: paulgross@paulhastings.com
Email: sarabricker@paulhastings.com

Eli B. Richlin
WILSON SONSINI GOODRICH &
ROSATI Professional Corporation
1301 Avenue of the Americas, 40th
Floor New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: erichlin@wsgr.com

*Counsel for Defendants-Appellees
RWE Renewables Americas, LLC and
RWE Renewables Services, LLC*

2